UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

SANDRA MANGUM                                                    PLAINTIFF

VS.                              CIVIL ACTION NO. 3:06CV701TSL-JCS

THE CATO CORPORATION
AND KROGER COMPANY                                              DEFENDANTS

<u>MEMORANDUM OPINION AND ORDER</u>

This cause is before the court on separate motions of defendants The Cato Corporation and Kroger Company for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Plaintiff Sandra Mangum, who is proceeding <u>pro</u> <u>se</u>, has responded in opposition to the motions and the court, having considered the memoranda of authorities, together with attachments, submitted by the parties, concludes that Cato's motion is well taken and should be granted, and Kroger's motion will be granted in part and denied in part.

Plaintiff Sandra Mangum, who was formerly employed by Cato, filed this action against Cato alleging claims of hostile work environment, disparate treatment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, <u>et</u> <u>seq</u>.  She also brought state law claims for malicious prosecution, false arrest, abuse of process, gross negligence and intentional infliction of emotional distress against Cato.  In addition, she has sued Kroger for breach of contract, breach of the duty of good

faith and fair dealing, negligence/gross negligence and malicious
prosecution.

CATO'S MOTION FOR SUMMARY JUDGMENT

The Parties' Versions of Events

Plaintiff's Version

Plaintiff began work at Cato's Richland, Mississippi store as
a second assistant manager in April 2005.  Plaintiff alleges that
as the sole black manager at the store, she was resented by her
white co-workers (her white "co-managers") because of her race and
was subjected to a hostile work environment from day one.
Plaintiff alleges that she informed her district manager, Debbie
Delatte, of the discriminatory treatment she was suffering, but
Delatte refused to listen or to try to help her in any way.  When
Delatte continued to be unresponsive to plaintiff's complaints,
plaintiff contacted Cato's corporate office to "accuse the
managers that represent Cato of discrimination and defamation of
character."

Plaintiff charges that as a result of her having complained
of discrimination, Cato contrived a plan to get rid of her.
According to plaintiff, pursuant to its scheme, Cato created a
fraudulent payroll check in plaintiff's name, using the number and
date of one of plaintiff's actual paychecks, so that it would
appear to have a basis for linking her to the fraudulent check.
Then, after purporting to "investigate" plaintiff's involvement in

2

the counterfeit check (but really making no investigation of any substance at all), Cato then pursued criminal charges against her and terminated her based on those criminal charges.  Although plaintiff was indicted by a grand jury for uttering a forged instrument based on the affidavit of Cato's Debbie Delatte, the charges were eventually *nolle prossed* because the prosecutor determined there was not enough evidence to get a conviction.

Cato's Version

Plaintiff began work at Cato's Richland store as a second assistant manager in April 2005.  District Manager Debbie Delatte was originally scheduled to audit the Richland store on June 5, 2005, but when she arrived, she could not find the necessary papers or books in the store.  Delatte told Mangum, the manager on duty at the time, she was rescheduling the audit for June 30, 2005.  During the rescheduled audit, Delatte found several issues that she tried to address with plaintiff, but plaintiff refused to take any responsibility and blamed others for the condition of the store; and while plaintiff complained of mistreatment by her co-workers; she did not assert any complaint of race discrimination. The following day, plaintiff contacted Cato's corporate office complaining of discrimination by her co-managers.  On July 8, 2005, Delatte returned to the store to go over the audit results with the store managers and to issue consultations (warnings or

3

write-ups) prepared as a result of the audit.  Plaintiff refused
to sign the consultations.

Not long thereafter, on July 25, 2005, Cato's bank informed
Cato's banking department that two Cato payroll checks with the
same check number (No. 53059), the same date (July 8, 2005), and
the same payee (Sandra Mangum) had been cashed.  The valid payroll
check was in the amount of $792.82 and the fraudulent check was in
the amount of $810.74.  The bank also advised that two additional
fraudulent payroll checks in the names of non-associates had been
cashed.  On July 28, 2005, Robert Sandler, Senior Vice
President/Corporate Controller with Cato, contacted Lonnell
Sheard, Regional Loss Manager for Cato, regarding the fraudulent
payroll check situation; Sheard in turn contacted Delatte and
asked her to meet him at the Richland store.  Before
going to the store, Sheard contacted the Richland Police
Department to file an incident report and discuss the situation.
He also went to the Kroger store where all of the subject checks
were cashed (including plaintiff's legitimate payroll check), and
spoke with a customer service manager regarding Kroger's check
cashing procedures.

According to Sheard, when he went to the Cato store to meet
with plaintiff, he tried to discuss the fraudulent checks with
plaintiff, but she became defensive and refused to answer his

4

questions or to discuss the situation at all.[1]  He informed
plaintiff she was suspended pending an investigation, and then,
after leaving the store, went to the Richland Police Department
and met with Detective Jim King and gave him the documentation he
had relating to the fraudulent payroll checks so that the police
could determine the appropriate action.  A few days later,
Delatte, after being contacted by Detective Jim King of the
Richland Police Department, signed a criminal affidavit that King
had prepared so that the police department could pursue charges
against plaintiff, two other persons to whom the fraudulent checks
had been made payable and the Kroger employee who had cashed all
three checks.  Detective King later presented the affidavit to the
municipal court judge, along with the facts of the case known to
the Richland Police, and the judge issued a warrant for
plaintiff's arrest.  Plaintiff was later arrested and indicted by
a Rankin County grand jury, but ultimately, the case against Ms.
Mangum was *nolle prossed*.

PLAINTIFF'S STATE LAW CLAIMS

Plaintiff has asserted a number of state law claims against
Cato.  For the reasons that follow, summary judgment will be
granted on each of these claims.

_____

[1]    Sheard states that plaintiff was "uncooperative," and
that she never denied involvement with the checks.  Plaintiff
maintains (and the court accepts this as true) that she told
Sheard she knew nothing about the checks.

<u>False Arrest, Abuse of Process and Intentional</u>
<u>Infliction of Emotional Distress</u>

Cato argues that plaintiff's claims for false arrest, abuse of process and intentional infliction of emotional distress are barred by the applicable one-year statute of limitations.  <u>See</u> Miss. Code Ann. § 15-1-35.  Plaintiff concedes her claims for false arrest and abuse of process are time-barred.  <u>See</u> <u>Sullivan v. Boyd Tunica, Inc.</u>, Civil Action No. 2:06CV016-B-A, 2007 WL 541619, at 3 (N.D. Miss. Feb. 16, 2007) ("A cause of action for abuse of process . . . accrues at 'the termination of the acts which constitute the abuse complained of, and not from the completion of the action which the process issued....'") (citing <u>Hyde Constr. Co. v. Koehring Co.</u>, 321 F. Supp. 1193, 1207 (S.D. Miss. 1969)); <u>Parker v. Mississippi Game & Fish Comm'n</u>, 555 So. 2d 725, 727 (Miss. 1989) ("[A] complaint for false arrest and false imprisonment accrue[s] on the date of arrest.").  As plaintiff concedes, these claims are barred, as Cato's Debbie Delatte signed the criminal affidavit initiating the criminal prosecution of plaintiff on August 2, 2005, and plaintiff was thereafter arrested on August 26, 2005, more than a year before she filed this lawsuit on December 13, 2006.

While plaintiff declares that her intentional infliction of emotional distress claim is timely, it is clear that is not the case.  Plaintiff states in her response that this claim "stems from her Title VII claim."  The last date on which Cato

6

communicated with plaintiff or engaged in any actions regarding plaintiff (other than in connection with plaintiff's EEOC charge and this lawsuit) occurred on August 2, 2005, when Delatte signed the criminal affidavit against plaintiff.  This claim is time-barred.

### Gross Negligence

Cato has moved for summary judgment on plaintiff's claim for "gross negligence" on the basis that it is barred by the exclusivity provision of the Mississippi Workers' Compensation Act.  In her response, plaintiff states that her claim for "gross negligence" is not barred because it is based on Cato's having committed fraud by making a fraudulent check payable to plaintiff using the check number of her legitimate check to link her to the fraudulent check so that it could pursue charges against her. Accepting that this is the basis of her claim of "gross negligence," then, if not subject to the Workers' Compensation exclusivity bar, see Hurdle v. Holloway, 848 So. 2d 183, 185 n.4 (Miss. 2003) ("If the injuries were caused by an intentional tort, the exclusivity provision would not apply.") (citing Miller v. McRae's, Inc., 444 So. 2d 368, 371 (Miss. 1984)), and Peaster v. David New Drilling Co., Inc., 642 So. 2d 344, 347 (Miss. 1994) (intentional tort exception to exclusivity bar applies only to actions taken with actual intent to injure employee)), this claim fails because plaintiff has no proof to support her theory that

Cato had any involvement in creating the fraudulent check.  If, on the other hand, her claim is that Cato was grossly negligent in its investigation of the fraudulent check, which seemed to be the case before she filed her response, then her claim is indeed barred by the exclusivity provision of the Workers' Compensation Act.  See Peaster, 642 So. 2d at 346-48.

Malicious Prosecution

A plaintiff claiming malicious criminal prosecution must prove each of the following elements:

(1) the institution or continuation of original judicial proceedings, either criminal or civil;

(2) by, or at the insistence of the defendants;

(3) the termination of such proceeding in plaintiff's favor;

(4) malice in instituting the proceeding;

(5) want of probable cause for the proceedings; and

(6) the suffering of injury or damages as a result of the action or prosecution.

Richard v. Supervalu, Inc., 974 So. 2d 944, 948-49 (Miss. Ct. App. 2008) (citing Alpha Gulf Coast, Inc. v. Jackson, 801 So. 2d 709, 721 (Miss. 2001)).  In the present motion, Cato concedes elements (1), (2), (3) and (6) are met, but submits that plaintiff cannot create a genuine issue of material fact as to the existence of malice (element (4)) or want of probable cause (element (5)).  The court looks first to the issue of probable cause.

8

"A claim of malicious prosecution will not lie if there was probable cause to make the arrest." <u>Id</u>. at 949 (citing <u>Van v. Grand Casinos of Miss., Inc.</u>, 767 So. 2d 1014, 1019-20 (Miss. 2000)). "'Probable cause is determined from the facts apparent to the observer when prosecution is initiated.'" <u>Id</u>. (quoting <u>Van</u>, 767 So. 2d at 1020). "'So long as the instigator of the action "reasonably believed he [had] a good chance of establishing [his case] to the satisfaction of the court or the jury[,]" he is said to have had probable cause"'." <u>Id.</u> (quoting <u>Van</u>, 767 So. 2d at 1020). <u>See also</u> <u>Hudson v. Palmer</u>, 977 So. 2d 369, 381 (Miss. Ct. App. 2007) ("In the context of a malicious prosecution claim, probable cause consists of a reasonable and honest belief in the guilt of the accused.") (citing <u>Coleman v. Smith</u>, 914 So. 2d 807 (Miss. Ct. App. 2005)); <u>Croft v. Grand Casino Tunica, Inc.</u>, 910 So. 2d 66, 72 (Miss. Ct. App. 2005) (to determine if probable cause existed, the court "will determine whether upon the appearances presented to the defendant, a reasonable person would have instituted the proceeding"). "When the facts are undisputed, it is the function of the court to determine whether or not probable cause existed." <u>Brabham v. O'Reilly Automotive, Inc.</u>, 438 F. Supp. 2d 680, 683 (N.D. Miss. 2006) (citing <u>Moon v. Condere Corp.</u>, 690 So. 2d 1191, 1195 (Miss. 1997)). <u>See also</u> <u>Van</u>, 767 So. 2d at 1019 (holding that "probable cause is a determination of law

for the trial judge when the facts themselves are not in dispute").

The facts known to Cato at the time it made the decision to pursue criminal charges against plaintiff were these:  Three fraudulent checks had been created.  One of those checks was created in the name of a Cato employee, and that employee was Sandra Mangum.  The check issued to Mangum had the same check number (79503) and the same date (July 8, 2005) as Mangum's legitimate payroll check.  There is no doubt (and plaintiff herself admits) that this was not a coincidence, and that whoever created the fraudulent check necessarily had access to plaintiff's legitimate payroll check, and this was a limited number of people. Moreover, the check was cashed at the same place that plaintiff had cashed her legitimate payroll check of July 8, 2005. Plaintiff acknowledged that the only people who might have had access to her legitimate payroll check would have been someone from Cato, herself, or someone from Kroger.[2]  While the evidence was obviously circumstantial and did not point overwhelmingly to

---

[2]    Plaintiff maintains that she was not involved in creating or cashing the fraudulent check and takes the position that Cato was responsible for creating (and cashing) the check to frame her so that it would have an excuse to terminate her in retaliation for her having complained of perceived racial discrimination.  Among other shortcomings, including the fact that plaintiff has no proof whatsoever to support this theory, plaintiff's theory about why Cato would have done this does not account for why Cato would have generated three fraudulent checks, two in the names of persons not known in any way to be affiliated with Cato or plaintiff.

plaintiff as the culprit, in the court's opinion, Cato could reasonably have believed it had a "good chance of establishing [its case] to the satisfaction of the court or [a] jury." <u>See Richard v. Supervalu</u>, 974 So. 2d at 949.[3]  The court therefore concludes that plaintiff cannot prevail on her malicious prosecution claim against Cato and summary judgment will be granted on that claim.


    <u>PLAINTIFF'S TITLE VII CLAIMS</u>

---

[3]     Plaintiff has claimed that Cato's loss prevention investigator, Lonnell Sheard, filed charges against her with the Richland Police Department before even talking with her about the checks.  The evidence does not support her position.  While Sheard did speak with Jim King before talking to plaintiff, no charges were "filed" or "initiated" until <u>after</u> he interviewed her.  In particular, the evidence shows that after gathering the check documents in its possession (which consisted of copies of the checks) and speaking with plaintiff and with the manager of the Kroger store where the checks were cashed, Cato's representative Lonnell Sheard, at the direction of Cato Senior Vice President Robert Sandler, turned over the information he had to Jim King of the Richland Police Department, so that the police could further investigate the matter.

Cato has presented evidence which establishes that Sheard then informed Debbie Delatte, Cato's district manager, that the police were investigating the checks and that the police might be contacting her about signing a criminal affidavit.  Detective King subsequently contacted Delatte, and told her the police believed there was a "gang" of people who cashed fraudulent checks at Kroger, but the only name Delatte recognized was Mangum's.  King advised Delatte that she would need to sign a criminal affidavit for the police to pursue criminal charges against plaintiff.  Delatte met King at the police station and signed an affidavit that had already been prepared by someone at the police station prior to her arrival.  The grand jury subsequently returned an indictment against plaintiff based on this affidavit.

<u>Hostile Work Environment</u>

Plaintiff's hostile work environment claim is based on allegations of mistreatment by some of her white co-workers. Among other things, she claims that they accused her of stealing, which made her feel so uncomfortable that she stopped carrying her purse into the store and began parking her car far away from the store so that no one could accuse her of stashing items in her purse or car. She also complains she was subjected to close scrutiny while clocking in or clocking out, and that she was "treated like a back door slave," because, while she had the title of "assistant manager," she was made to clean the store while her white co-workers did paperwork. In the court's opinion, plaintiff's claim must fail because she "has not adduced (competent) evidence that any of the alleged harassing events were based on race or had a racial character or purpose." <u>See</u> <u>Watkins v. Texas Dept. of Criminal Justice</u>, No. 06-20843, 2008 WL 686571, at 5 (5th Cir. March 12, 2008).

To establish a prima facie case of hostile work environment, plaintiff must show: "(1) that she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment affected a term, condition, or privilege of employment; and (5) the defendant knew or should have known of the harassment, yet failed to take prompt remedial action." <u>Id</u>. (citing <u>Felton v. Polles</u>, 315 F.3d

12

470, 484 (5th Cir. 2002)).  "The Supreme Court has explained that in determining whether a workplace constitutes a hostile work environment, courts must consider 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance.'" Id. (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)). "'Similarly, [the Fifth Circuit] has acknowledged that for harassment to be actionable, it must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Id. (quoting Ramsey v. Henderson, 286 F.3d 264, 268 (5th Cir. 2002)).

In the case at bar, plaintiff testified that her co-workers were "always" accusing her of stealing; but, in fact, she identified only a few instances of what she perceived to be accusations of theft.  She testified that on her first day of work, she purchased a pair of shoes from Cato because the shoes she had worn to work became uncomfortable; when the white manager, Wendy Lambert, saw her with the shoes, she asked plaintiff, "Where did you get those shoes from?"  Plaintiff felt that Wendy was

insinuating that she had stolen the shoes because Wendy's "whole demeanor was just wrong."[4]

In a related vein, she testified that when she would clock in and out, which was done using the cash register or "ISP," Wendy, and assistant managers Emily Castleberry and Anne Turnage, would "sit there and gaze at me the whole time I'm there clocking in, like I'm going to take something, you know."  When plaintiff was asked why she thought they would be watching her, she responded, "I don't know if -- I guess they thought I was going to take money."  She admitted that they never actually said that, but according to plaintiff, "their demeanor said it."

Finally, plaintiff testified that on one occasion, after it was discovered that some money was missing, Cindy Volt, the regional manager, called her and asked her, "Where is the money?"  Plaintiff told Volt that she did not have it and that Volt ought to talk to Anne Turnage and Angie Sultan, because they had been in control of the money.  Plaintiff testified she believes this incident was racially motivated:  "How I tie that to race [is] because I was black.  They told her I got the money.  She believed

---

[4]     Plaintiff testified that on another occasion, a woman she recognized as a black manager from the Magee Cato store, came into the store, and when plaintiff introduced herself and offered to assist her, the woman remarked, "Oh, you're the lady that Wendy said always be stealing."  Even if otherwise probative of plaintiff's claim, this alleged statement is inadmissible hearsay.  See Warfield v. Byron, 436 F.3d 551, 559 (5th Cir. 2006) (noting that hearsay evidence is inadmissible for summary judgment purposes).

it.  Why didn't they get the money?  They had control of it.
Accuse the black guy."[5]  Yet plaintiff admitted she did not know
whether Volt had similar conversations with Angie and/or Anne, she
did not know what Volt may have asked them and she did not know
what they had told Volt.  She only speculated that they must have
told Volt she took the money.  Moreover, there is nothing to
suggest that Volt pursued the matter with plaintiff after
plaintiff denied any knowledge of the money.[6]

---

[5]     Plaintiff has repeatedly insisted that all the alleged
accusations (or insinuations) that she had or would steal were
based on her race.  In her deposition, plaintiff testified as
follows:

> See, they was doing these things to me because – like
> the – accusing me, I mean, it's the oldest thing.  When
> you want to get – and I hope y'all don't take this the
> wrong way, but – I'm – I'm not a prejudiced person.  But
> they – black people have been used for an scapegoat for
> many, many, many years and to say that I stole
> something – well, of course, they'll believe it.
>
>       She's black, you know, and especially, if these
> people prejudiced, they don't really care for black
> people, you know.  And that's why they accused me of
> different things because I was black, and they always
> think that black people – which everybody commit crimes;
> everybody do.  A lot of people don't get caught.  They
> commit them in different ways, but we are the most
> persecuted race for these kinds of stuff.

[6]     Plaintiff also claimed that her white co-workers tried
to entrap her into stealing.  She testified:

> I would open the store, and I would go in there, and I
> would see hundred dollar bills on the floor.  I told
> [Delatte] about that.  I guess they was – was hoping
> that I would take those hundred dollar bills and just
> stuff them in my pocket and go, but I would throw them
> in the bank bag . . . .

Plaintiff's suggestion that her white co-workers planted the
alleged hundred dollar bills to entrap her, and to do so because
she is black, is rank speculation.

Plaintiff may believe that her co-workers suspected her of stealing and accused her of theft and that they did this because of her race, but it is plain from a review of the record that she has no evidence to substantiate her subjective beliefs.  To support a hostile work environment claim, the challenged conduct need not be "explicitly" racial, but it must have a "racial character or purpose."  See Hardin v. S.C. Johnson & Son, Inc., 167 F.3d 340, 345 (7th Cir. 1999) (emphasis in original) (cited in Watkins, 2008 WL 686571, at 5).  Moreover, the Fifth Circuit "has consistently held that an employee's subjective belief of discrimination alone is not sufficient to warrant judicial relief."  Auguster v. Vermilion Parish Sch. Bd., 249 F.3d 400, 403 (5th Cir. 2001)) (internal quotation marks and citation omitted).  See also Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1429 (5th Cir. 1996) (holding that "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden" at the summary judgment stage of an employment-discrimination case).

Plaintiff's hostile work environment claim is also based, in part, on her allegation that whenever she was working at closing time, she was always the one who had to do "the physical work, as far as the cleaning and that sort of thing," which involved vacuuming, clearing out the fitting rooms, cleaning the bathrooms and straightening up the clothing racks.  As with the alleged

accusations of stealing, she believed this occurred because of her race:  "They felt – they treated me like, you know, since you black, you go out there and clean.  That's what y'all do." However, she has no proof to suggest that she was asked to clean because she is black.  Furthermore, she agreed that "Wendy would vacuum sometimes" when the two closed together (even though Wendy was the manager and could have delegated <u>all</u> the cleaning tasks to plaintiff), and she acknowledged that white employees did the cleaning when she was not assigned to work closing.  Moreover, plaintiff does not and cannot reasonably dispute that cleaning the store was within her job description.

Finally, plaintiff complained, in general, that Wendy Lambert gave her a "hard time" any way she could.  The only example she cited of being given a "hard time," other than those already addressed, was Wendy's telling plaintiff she needed to work faster when she was processing clothes (i.e., taking them out of the box, putting them on hangers and putting them out on the floor"), and her once timing plaintiff when she was processing clothing. However, there is nothing to suggest that episode was based on race or had a racial purpose, and it certainly does not qualify as sufficiently severe or pervasive to constitute a hostile work environment.[7]

---

[7]     Although not addressed in the parties' memoranda, the court notes that in her deposition, plaintiff testified that she believed someone had tampered with her W-4 form because when she

Disparate Treatment

Plaintiff alleges she was subject to disparate treatment, i.e., that similarly situated white employees were treated more favorably, in that (1) although she was hired as a full-time second assistant manager and expected to work forty hours a week, she was not allowed to work a full-time schedule until nearly a month into her employment; (2) she was assigned different chores than white employees;[8] (3) Wendy Lambert failed four store audits and was issued three "consultations" and yet was not terminated; and (4) she was terminated because of the fraudulent payroll check when another associate, Anne Turnage, was not terminated for similar fraudulent activity.

In order to establish a prima facie case of discrimination based on race a plaintiff must usually show that (1) she suffered

_____

got her first paycheck, the amount seemed wrong.  She discovered that she was in the "single with no dependents" tax bracket when she had indicated on her tax papers that she was "head of household" with five dependents.  Although she did not know who had tampered with the forms, she indicated that both Debbie Delatte and Wendy Lambert had access to the forms.  She believed that Wendy was the more likely suspect because, as she put it, "Wendy didn't like me being there.  She didn't like me being a black person.  She never liked me, and it was because I was black because it was no other reason."  Plaintiff has no proof that Wendy or anyone else "tampered with" her tax forms, and certainly no proof that anyone tampered with her tax forms because she is black.

[8]    Plaintiff's allegation regarding the chores she was assigned is offered as evidence of both disparate treatment and a hostile work environment.

18

an adverse employment action; (2) she was qualified for the position; (3) she was within the protected class at the time of the decision; and (4) she was replaced by someone outside the protected class, or, alternatively, that others similarly situated but not in her protected class were more favorably treated.  See Rios v. Rossotti, 252 F.3d 375, 378 (5th Cir. 2001); Bryan v. McKinsey & Co., Inc., 375 F.3d 358, 360 (5th Cir. 2004).  The Fifth Circuit has strictly interpreted the "similarly situated" requirement to mean "nearly identical."  See Ryburn v. Potter, 155 Fed. Appx. 102, 107 (5th Cir. 2005) (per curiam) (quoting Wyvill v. United Cos. Life Ins. Co., 212 F.3d 296, 304 (5th Cir. 2000)).  Thus, to satisfy the "similarly situated" requirement, "the situations of the plaintiff and the non-protected class member must be more than similar, they must be 'nearly identical.'" Dortch v. Memorial Herman Healthcare System-Southwest, 525 F. Supp. 2d 849, 862 (S.D. Tex. 2007) (citing Perez v. Tex. Dept. of Crim. Justice, 395 F.3d 206, 213 (5th Cir. 2004)).

Cato's motion in the case at bar focuses on the fourth element of plaintiff's prima facie case.  Cato argues that plaintiff cannot prevail on her race discrimination claim because she cannot show that any of the alleged white "comparators" were in a similar, much less "nearly identical" situation.

At the time she became employed by Cato as a second assistant manager at the Richland store, Mangum became one of six employees,

19

and one of four management employees at that store:  Wendy Lambert
(white) was the store manager; Anne Turnage (white) was the first
assistant store manager; Emily Castleberry (white) was a second
assistant store manager; and there were two associates, Brittany
Bomar and McKenya Peterson.  On May 13, 2005, after having
received a "consultation" (i.e., write-up or warning) regarding
unacceptable audits, Wendy Lambert resigned, and not long
thereafter, on May 18, Emily Castleberry abandoned her job.  At
that time, Angie Sultan became acting store manager.

Plaintiff complains that as a full-time second assistant
store manager, she expected to work forty hours a week, but was
not given a full-time schedule until May 2005, when the store
became understaffed.  However, the record shows without
contradiction both that "full time" employment for a second
assistant manager was "30+ hours" per week,[9] and that with the
exception of her very first pay period in early April, plaintiff
did work "full time" hours, i.e., more than thirty hours per week.

Plaintiff next complains that Wendy Lambert "failed" four
audits and received three written consultations from those audits,
and yet was not terminated.  But, while plaintiff theorizes that
Cato undertook the June 30 audit and issued her consultations on

---

[9]     Plaintiff states she was not told at the time of hiring
that she could only expect to work 30 hours a week as a full-time
second assistant manager.  However, regardless of whether she was
informed of this, Cato's policy is that 30+ hours per week is
full-time for a second assistant manager.

July 8 as a means of paving the way (i.e., "creating a paper trail") for her eventual termination,[10] the fact is, Cato did not purport to terminate her based on the audit and resulting consultations.  Accordingly, the fact that Wendy Lambert also was not terminated for her poor audits and consultations is meaningless.

While plaintiff alleges that she was required to do all the cleaning on the nights she was scheduled to close, she has not demonstrated that white employees were not also required to perform these cleaning duties.  She acknowledged, in fact, that on nights she was not scheduled to work, white employees cleaned the store.  And she acknowledged that when she was still employed, Wendy Lambert did some of the cleaning when plaintiff was present.[11]

Plaintiff finally charges that Anne Turnage was treated differently because she was not terminated for an "insufficient funds" check she wrote to Cato, while plaintiff was suspended and ultimately terminated for her alleged involvement in the fraudulent payroll check.  In this regard, the evidence establishes that Turnage wrote a check to Cato that was returned

---

[10]   Plaintiff argues that Cato's "objective was to use the June 30, 2005 audit to document excuses to terminate Plaintiff for complaining of discrimination."

[11]   Plaintiff admitted, as well, that both Wendy Lambert and Angie Sultan were higher in the management hierarchy, and had different job responsibilities than she.

for insufficient funds.  Turnage admitted she had written the check, but claimed that it bounced only because her payroll check from Cato came late, so that she was not able to cover the check. She admitted that three other checks were returned for the same reason, and complained that this happened regularly.

Plaintiff submits that she was subjected to disparate treatment because, whereas she was suspended and then terminated for allegedly cashing a fraudulent check from Cato, Turnage's employment was "never interrupted" notwithstanding her having "cash[ed] a check she well knew that she didn't have any money to cover the check but she wrote any[way] and [her having] admitted that she wrote bad checks on a regular basis."  It is manifest that while both of the cited incidents involved dishonesty, the circumstances of the two incidents (one involving writing a bad check to Cato and the other involving creating and cashing a fraudulent check drawn on Cato's account) cannot reasonably be characterized as "nearly identical."[12]  Thus, Turnage is not a similarly situated comparator.[13]  See Brown v. United Parcel

_____

[12]   The court notes, too, that whereas the conduct with which plaintiff was charged was clearly a terminable offense, Cato's disciplinary policy provided that an employee would receive a warning for a first NSF check, but that a subsequent bad check written to Cato would constitute a terminable offense.  Turnage wrote only one NSF check to Cato and received a warning.

[13]   As Cato hired a black woman to replace plaintiff, the only avenue available to her for seeking to prove discriminatory discharge is to prove that a similarly situated white employee was not discharged under nearly identical circumstances.  This, she

Service Inc., 238 Fed. Appx. 8, 2007 WL 1598180 (5th Cir. 2007) (plaintiff failed to establish prima facie case of discrimination because, while both plaintiff and her alleged comparator engaged in dishonest conduct, the plaintiff's "dishonesty was of a different magnitude").

In sum, plaintiff has failed to establish that there was any circumstance in which a "similarly situated" employee was treated more favorably, and therefore, summary judgment will be granted on this claim.[14]

Retaliation

Under Title VII, a plaintiff may prove retaliation either by direct or circumstantial evidence.  McCoy v. City of Shreveport, 492 F.3d 551, 556 (5th Cir. 2007).  A case built on circumstantial evidence is analyzed pursuant to the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).  McCoy, 492 F.3d at 556. Thus, in order to maintain an action for retaliation, a plaintiff

_____

has not done.

[14]     If the plaintiff were to establish a prima facie case of discrimination, the burden would shift to the defendant to articulate a legitimate, nondiscriminatory reason for its disparate treatment of the plaintiff, and if it did so, the burden would shift to the plaintiff to produce admissible evidence which demonstrates that the employer's reason is a pretext for prohibited discrimination.  Because plaintiff has failed to establish a prima facie case of discrimination, the court need proceed no further in its evaluation of her claim.

must make a prima facie showing that: (1) she participated in an activity protected by Title VII, (2) her employer took an adverse employment action against her, and (3) a causal link exists between the protected activity and the adverse employment action. Banks v. E. Baton Rouge Parish Sch. Bd., 320 F.3d 570, 575 (5th Cir. 2003).  If the plaintiff establishes a prime facie case, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the employment action.  Gee v. Principi, 289 F.3d 342, 345 (5th Cir. 2002).  If the employer does this, the burden shifts the plaintiff to then prove that the employer's proffered reason is a pretext for an actual, retaliatory, purpose.  McCoy, 492 F.3d at 557.

In support of her retaliation claim, plaintiff alleges that in late April 2005, soon after she began work at Cato, she complained to her district manager, Debbie Delatte, that she was being mistreated by her white co-workers.  Plaintiff claims she told Delatte she believed her co-workers were always doing things to her because they were prejudiced against her and did not like her because she is black.[15]  Plaintiff complained to Delatte they

---

[15]   For her part, Delatte does not deny that plaintiff complained about her co-workers, but she denies that plaintiff ever told her of any conduct which plaintiff thought was racially motivated.  For purposes of the present motion, the court accepts plaintiff's version of the facts.  See United Fire & Cas. Co. v. Hixson Bros., 453 F.3d 283, 285 (5th Cir. 2006) ("In determining whether there is a genuine issue of material fact, all facts must be evaluated in the light most favorable to the non-moving party.").

were not giving her enough hours, were making her do the cleaning
and were accusing her of stealing.  According to plaintiff,
Delatte was unreceptive and unhelpful; "she didn't care about it."
Her only response was to tell plaintiff, "Well, I know there's
some things going on, but it's going to get better."  Plaintiff
asserts that from that day on, because she complained about race
discrimination, Cato wanted her gone.

On June 30, 2005, Delatte went to the Richland store to
conduct a store audit.  According to Cato, during the audit,
Delatte identified a number of violations of store policy,
including that (1) on May 25, 2005, the policy for processing
business checks was not followed; and (2) on June 27, 2005, a bank
deposit was made late and the verification of the deposit was not
timely made.  It claims that when Delatte tried to discuss these
issues with plaintiff, she became confrontational and defensive.
She blamed others for the problems, refusing to take any
responsibility for the condition of the store; she criticized the
way the store was being managed, and berated the other employees,
calling them liars, lazy and incompetent.  And she told Delatte
she thought there was a conspiracy against her and that the only
way Delatte would be rid of her was to fire her.

Plaintiff's and Delatte's version of this audit are only
slightly consistent.  Plaintiff posits that the audit by Delatte
was not legitimate, but that instead, Delatte came there that day

25

"to intimidate [her]," and "to get [her]" by creating a paper trail so Cato could eventually fire her.[16]  Plaintiff states that during the audit, Delatte did not discuss with her the alleged violations Delatte had discovered[17] and that plaintiff did not become confrontational and defensive.  She claims, though, that she did become emotional when she tried to talk to Delatte about the mistreatment she was experiencing from her co-workers.  She also tried to tell Delatte about acts of dishonesty by her co-

---

[16]    Cato claims that Delatte had originally gone to the store to conduct the audit on June 5, but had to reschedule because she could not find the necessary paperwork.  Delatte maintains that plaintiff was present on that occasion and was aware that Delatte could not find the paperwork and that she was going to return later to conduct the audit.  Plaintiff denies all of this and claims that Delatte first came to do an audit on June 30.

[17]    According to plaintiff, Delatte did tell plaintiff she would have to take points off the audit because the bills in the cash drawer were turned the wrong way, but plaintiff responded that she had never been told or trained to place the bills in the drawer in any particular way.  Plaintiff claims that Delatte did not mention or indicate to plaintiff in any way that she had come across any issues of plaintiff's having violated company policy, other than the bills being turned the wrong way.  Thus, plaintiff also disputes testimony from Delatte that when she left the store on June 30, plaintiff was informed and knew that "consultations" or warnings would be forthcoming based on the problems Delatte discovered at the store on June 30.

workers,[18] but Delatte "didn't want to hear it."  Delatte, she says, "cut [her] off" or "just turned a deaf ear to it."

Thus, on July 1, having found Delate unresponsive, plaintiff telephoned Cato's corporate offices to find out who she needed to talk to about her allegations of discrimination.  Plaintiff was given the name of Sandy Waverka.  Plaintiff tried to contact Waverka by phone, but, getting no answer, decided to send her an email instead.  In her email, Mangum wrote:

> I have every logical reason to accuse the managers that represent Cato of discrimination and defamation of character[.]  I have endured a lot since I've worked for this company[.]  I have tried to talk to my DM about my situation, but she repeatedly deny me that opportunity. I don't know who I'm suppose to talk to about this so will you please direct me to the right person or office[.][19]

_____

[18]    Plaintiff told Delatte she had found that Anne and Angie had used plaintiff's associate number several times on a day when plaintiff was not in the store; that they worked "off the clock" and edited their time; and that money had come up missing from the money bag on May 14th and the while Angie and Anne had accused her of taking the money, they were the ones in control of the money.

[19]    On the same day plaintiff sent this email to Waverka, she also telephoned and sent a follow-up email to Cato's Loss Prevention Department, in which she stated that she had "notice[d] suspicious behavior" by members of the staff at the Richland store, and specifically, that another associate had used plaintiff's associate number several times on a day when plaintiff was not in the store; that this same associate received a lot of personal phone calls; that this associate works "off the clock" and edits her time and had an associate ring up items for her when that should be done by a manager; and that money had come up missing from the money bag on May 14th and the store manager and another associate (who in fact had control of the money) had accused her of stealing the money.  Plaintiff further wrote:
> I have reasons to believe that I'm a target for
> conspiracy.  On June 15th I opened the store counted

Waverka forwarded plaintiff's email to Rhonda Poplin, of Cato's
Human Resources Department, on July 6.  Neither contacted
plaintiff regarding her allegations.

On July 8, Delatte returned to the Richland store to discuss
the results of the audit and to issue "consultations" about the
problems she had found.  According to Delatte, three consultations
were issued to plaintiff, two for the issues that had been
discovered in the audit, and a third because Delatte had learned
that plaintiff had clocked in late twice and the store had been
kept open late once after the date of the audit.  Plaintiff
refused to sign the consultations, and admits as much, but claims
she did so because she did not consider it fair that Delatte was
dredging up old incidents (the check cashing incident had occurred
over a month before); that Delatte was giving her consultations
for violations of procedures on which she had received no training
and of which she had no knowledge; and that Delatte was attempting

---

down the money for both cash registers register #2 was
short 10.00 I called loss prevention and reported it I
never heard anything else about it. We had a visit from
Ms. Cindy Volk (regional manager) that same day.  I
informed the DM concerning the employee using my
employee ID and the money shortage on 5/14/05.  Ms.
Delatte refuse to hear anything else I have to say
concerning this employee's behavior.

Plaintiff's email was forwarded to Lonnell Sheard, who was
directed to investigate plaintiff's allegations in his next
scheduled visit to the store.  However, the incident involving the
fraudulent check and plaintiff's resulting suspension/termination
occurred before Sheard's "next scheduled visit" to the Richland
store.

to blame her for the condition of the store when the store had been in terrible shape for months before plaintiff came on board.

Three weeks later, on July 28, Lonnell Sheard appeared at the Richland store to question plaintiff about the counterfeit payroll check that had been issued in plaintiff's name on Cato's account and cashed at the local Kroger store.  Although plaintiff denied any knowledge of the check, plaintiff was immediately suspended without pay pending an investigation.  That same day, she sent an email to Sandy Waverka, in which she declared, "Discrimination is still taking place at the Richland Cato Store #0434."  A few hours later, she send a second email to Waverka, stating:

> Ms. Waverka I sent you an email making you aware of my
> situation.  I expressed my difficulties to the fullest.
> No one ever addressed my issues now my situation has
> took a turn for the worse I have been accused of fraud.
> And relieved of my duties just as I stated to you before
> I would like to speak to someone concerning my issues.

On July 29, Waverka forwarded the emails to Rhonda Poplin, and apparently also spoke with plaintiff, who emailed Poplin on August 1, explaining she had emailed Waverka "with [her] issues," that Waverka had forwarded her email to Poplin, and that she had not received a response and was trying to inquire "to whom do I need to speak concerning these issues?"  On that date, plaintiff also filed a charge with the EEOC, in which she asserted that she had been subjected to race discrimination, and that she had complained to Cato about her mistreatment and declared, "On July 28, 2005, I was suspended, pending an internal investigation.  I believe that

I am being set up to be discharged because of my race." Plaintiff sent a second email to Poplin the following day, stating she had not received a response to her prior emails, including her email of July 1, which had been forwarded to Poplin on July 6, and asking Poplin to contact her. She did not mention to Poplin that she had filed a charge of discrimination and retaliation with the EEOC.

In the meantime, Delatte had signed a criminal affidavit against Mangum charging her with uttering a forged instrument. An arrest warrant was subsequently issued for plaintiff's arrest, and she was arrested and later indicted by a Rankin County grand jury. In view of the criminal charges brought against plaintiff, she never resumed her employment with Cato following her suspension on July 28, 2005. Plaintiff later amended her EEOC to allege that Cato "had [her] arrested" in retaliation for her complaints of race discrimination.[20]

The undisputed facts establish that plaintiff participated in an activity protected by Title VII and that by firing her, Cato took an adverse employment action against her. Moreover, in view

---

[20]     Cato explains that the decision to prosecute was effectively also a decision to terminate plaintiff's employment, but due to an administrative oversight, she was not removed from "inactive" status in the company's records until February 2006. In an amendment to the EEOC charge filed September 14, 2005, plaintiff stated that although Cato had originally only suspended her, she had since been arrested, and she declared, "I believe that I have been discharged in retaliation and also because of my race (black)."

of the close temporal proximity between plaintiff's complaints of discrimination and her suspension and eventual discharge, the court assumes, for present purposes, that plaintiff has demonstrate the "causal link" required to establish her prima facie case of retaliation.  See Stroud v. BMC Software, Inc., No. 07-20779, 2008 WL 2325639 (5th Cir. June 6, 2008) ("Close timing between an employee's protected activity and an adverse action against [her] may provide the 'causal connection' required to make out a prima facie case of retaliation.") (quoting Swanson v. Gen. Servs. Admin., 110 F.3d 1180, 1188 (5th Cir. 1997)).  However, Cato insists that summary judgment is in order because it clearly had a legitimate, non-discriminatory reason for firing her, namely, its reasonable belief of her involvement with the fraudulent check, which plaintiff cannot prove was a pretext for an actual, retaliatory, purpose.

The court is of the opinion that Cato has shown that it had a legitimate basis, having nothing to do with plaintiff's race, for her termination.  The court has concluded that Cato had reasonable cause to believe plaintiff was involved in the fraudulent check scheme, a clearly terminable offense, and plaintiff has failed to adduce sufficient evidence to create an issue for trial on whether Cato's reason was pretext for a true retaliatory motive.

The court recognizes plaintiff's assertion that Cato began "looking for ways" and "plotting" to terminate her after she

31

complained of discrimination, both to Delatte and to Cato's corporate office via her July 1 email to Waverka.  She takes the position that it found a way to accomplish its goal:  It framed her for a crime she did not commit, creating a fraudulent/counterfeit check made payable to her, using the same number and date as her legitimate payroll check to tie her to the fraudulent check, and then had her charged and prosecuted for uttering a forged instrument, all so that it would have an excuse to fire her.   Plaintiff may believe this is what happened, but she plainly has no evidence to support her theory.  This is pure conjecture on her part.  There is no evidence that Cato manufactured a basis for firing plaintiff.  Nor is there any other basis for concluding that Cato's proffered reason for firing her was not its true reason.  Accordingly, the court concludes that plaintiff has failed to create a genuine issue of material fact on her claim for retaliation.

KROGER'S MOTION FOR SUMMARY JUDGMENT

The fraudulent payroll check on which the criminal prosecution of plaintiff was based, and which led to her termination, was cashed at the Kroger store in Richland by Kroger employee Victoria Keyes.  The two other counterfeit Cato payroll checks, payable to Shirley Jackson and Tracy Smith, were also cashed at Kroger, also by Victoria Keyes.  In cashing these checks, Keyes did not follow Kroger's check cashing policy and

procedure, which required securing proper identification from the payee.[21]

Plaintiff has sued Kroger, alleging claims for breach of contract, breach of the duty of good faith and fair dealing, malicious prosecution, negligence and gross negligence.

Breach of Contract

In order to cash a payroll check at the Kroger store, an individual must sign a "Participation Agreement for Kroger SecureTouch Payroll Check Cashing." Plaintiff signed such a Participation Agreement in June 2005. In this action, she has sued Kroger for breach of the Participation Agreement, alleging that Kroger "committed breach of contract when they allowed a counterfeit check in the amount of $810.74 to be cashed bearing the name of the plaintiff in which caused plaintiff to suffer malicious Prosecution."

The Participation Agreement recites,

I (plaintiff) authorize Kroger to electronically read
the information from my Driver License as part of the
process that allows me to cash payroll checks at Kroger.
I understand that the information gathered by

---

[21]    Keyes was terminated upon Kroger's discovery
of her actions in cashing the forged Cato payroll checks in direct
violation of Kroger's check cashing policy. Plaintiff argues
there is a conflict in the evidence as to the reason for Keyes'
termination as Kroger's records reflect she resigned after being
counseled for failing to report to work. Although the reason for
Keyes' termination is not material, Kroger has submitted an
affidavit from Kroger manager Steve Sims who states that Kroger
Human Resources made a mistake on the separation sheet when it
indicated that Keyes quit voluntarily.

SecureTouch Payroll Check Cashing is intended to give me
the very best service, and that Kroger will not sell
and/or license my personal information, financial
information or finger image information to any third
party.  I further understand that all information
collected will be held in the strictest of confidence by
Kroger.

Plaintiff alleges that in light of Kroger's having cashed a
fraudulent payroll check in her name without following its proper
check cashing procedures, including securing the proper
identifying information, Kroger did not provide her "the very best
service."  In its motion, Kroger submits that plaintiff's effort
to base a claim for breach of contract on the language set forth
in the Participation Agreement is "a stretch."  It argues that
plaintiff has failed to establish a breach of this "contract" by
Kroger, as she has presented no evidence to show that the
information gathered was not intended to give her the very best
service, as the contract provides, nor has she shown that Kroger
sold and/or licensed her personal information, financial
information or finger image information to any third party.  The
court agrees.  The Participation Agreement reflected plaintiff's
agreement that as a condition of being extended check cashing
privileges by Kroger, she would furnish certain information as
requested by Kroger, including her driver's license and
fingerprint.  The statement in the agreement that this information
was being gathered by Kroger so that it could provide its
customers the "very best service" was not a contractual

undertaking by Kroger to provide the "very best service," an amorphous concept certainly, and plaintiff cannot predicate a claim for breach of contract on this statement.

Malicious Prosecution[22]

Kroger is entitled to summary judgment on any claim of malicious prosecution plaintiff may have undertaken to assert against Kroger.  To prevail on a claim for malicious prosecution, plaintiff must show that the defendant initiated criminal proceedings against her.  See Richard v. Supervalu, 974 So. 2d at 948-49.  Cato, not Kroger, instituted the criminal proceedings against plaintiff.  Therefore, plaintiff has no viable claim for malicious prosecution against Kroger.

Breach of Duty of Good Faith and Negligence/Gross Negligence

The premise of Kroger's motion for summary judgment as to plaintiff's claims for breach of the duty of good faith and fair dealing and for negligence and/or gross negligence is that Kroger cannot be held vicariously liable for Victoria Keyes' actions under the doctrine of respondeat superior because Keyes'

---

[22]   Kroger indicates in its motion that it has moved for summary judgment on a claim for malicious prosecution because "liberally reading [plaintiff's complaint], one could argue that Plaintiff also asserts claims against Kroger for malicious prosecution. . . ."  The court has reviewed plaintiff's complaint and amended complaints and does not find any such claim. Nevertheless, as Kroger has addressed this putative claim, so will the court.

actions in cashing the forged checks were unauthorized and not in furtherance of Kroger's business and hence clearly outside the scope of her employment.  The Mississippi Supreme Court has summarized the applicable principles for assessing respondeat superior as follows:

> An employer is liable for the torts of his employee only
> when they are committed within the scope of employment.
> Odier v. Sumrall, 353 So. 2d 1370, 1372 (Miss. 1978).
> To be "within the scope of employment," the act must
> have been committed in the course of and as a means to
> accomplishing the purposes of the employment and
> therefore in furtherance of the master's business.
> Sears, Roebuck & Co. v. Creekmore, 199 Miss. 48, 23 So.
> 2d 250, 252 (1945); Alden Mills v. Pendergraft, 149
> Miss. 595, 115 So. 713, 714 (1928).  Also included in
> the definition of "course and scope of employment" are
> tortious acts incidental to the authorized conduct.
> Creekmore, 23 So. 2d at 252.  Stated another way, a
> master will not be held liable if the employee "had
> abandoned his employment and was about some purpose of
> his own not incidental to the employment."  Odier, 353
> So. 2d at 1372 (citing Loper v. Yazoo & M.V.R. Co., 166
> Miss. 79, 145 So. 743 (1933); Canton Cotton Warehouse
> Co. v. Pool, 78 Miss. 147, 28 So. 823 (1900)).  That an
> employee's acts are unauthorized does not necessarily
> place them outside the scope of employment if they are
> of the same general nature as the conduct authorized or
> incidental to that conduct.  Southern Bell Tel. & Tel.
> Co. v. Quick, 167 Miss. 438, 149 So. 107, 109 (1933).

Adams v. Cinemark USA, Inc., 831 So.2d 1156, 1159 (Miss. 2002).

In its motion, while Kroger argues that it is in the grocery business, not the check cashing business, it acknowledges that it provides a check cashing service for the convenience of its customers and that Keyes' job responsibilities at Kroger included cashing checks.  It argues, though, that Keyes was only supposed to cash checks pursuant to Kroger's Check Acceptance Procedure and

Policy, and that by cashing the subject check in violation of Kroger policy, she acted without authorization and hence beyond the course and scope of her employment.

In the court's opinion, if Keyes was a knowing participant in the forged check cashing scheme, so that she acted intentionally to effect and/or facilitate theft of funds from her employer, then she acted outside the course and scope of employment.  See Berhow v. The Peoples Bank, 423 F. Supp. 2d 562 (S.D. Miss. 2006) (granting summary judgment for employer bank where bank employee committed fraud because there was no evidence that "stealing money from the Bank was the kind of work that he was employed by the Bank to perform, (or) and that his conduct in stealing money was done in part to serve the Bank").  That would not be the case, however, if she was merely negligent in cashing the check in violation of Kroger's check cashing policy.  An employee does not act outside the course and scope of her employment just because she fails to follow company policy with respect to a task which undeniably falls within her job description.  Kroger has not argued that Keyes' actions were intentional; it declares, in fact, that it "does not know why Keyes cashed the forged checks in violation of its policy."  Thus, the court must conclude that Kroger has not demonstrated it is entitled to summary judgment;

37

that is, Kroger has not shown that as a matter of law, it cannot

be held vicariously liable for any alleged negligence by Keyes.[23]

     The court notes that in her response to Kroger's motion,

plaintiff disputes Kroger's assertion that it was a victim of the

counterfeit check scheme and argues that Kroger was, in fact, a

knowing participant in this scheme, positing that Kroger conspired

with Cato to set her up for criminal prosecution in connection

with the counterfeit check.  She declares, after identifying what

she believes to be discrepancies and inconsistencies in Kroger's

documents and proof, that "Cato and Kroger orchestrated a check

cashing scheme."  She further argues that a "management override"

notation on the back of the counterfeit check payable to her shows

that a manager, not Keyes, was responsible for cashing the check.

She insists, in fact, that "Kroger has not produced any proof that

any one by the name of Victoria Keyes was involved in the alleged

check cashing scheme."  Plaintiff thus concludes that the facts

prove that Kroger itself, through its manager, "willfully failed

---

[23]     In its memoranda, Kroger repeatedly asserts it was a
victim in this forged check cashing scheme because it lost
$1,790.76, the total value of these forged Cato payroll checks, as
a result of Keyes' unauthorized conduct in cashing these checks in
violation of Kroger's policy.  Notwithstanding plaintiff's
insistence that Kroger has not shown it was a "victim," it is
apparent that Kroger was a "victim" to the extent that it suffered
a monetary loss as a result of Keyes' actions, whether those
actions were intentionally fraudulent or merely negligent.
Whether Kroger might nevertheless be legally accountable for
Keyes' actions, i.e., if she was negligent, is another matter.

to follow their policies and committed fraud in doing so," and that "Kroger manager or managers acted within the scope of employment when cashing counterfeit check."

Kroger correctly points out in its rebuttal that plaintiff has not offered no evidence whatsoever to support her outlandish conspiracy theory. Moreover, Kroger has offered affirmative proof, an affidavit from Kroger manager Steve Sims, that "a Kroger employee named Victoria Keyes cashed all three forged Cato payroll checks." In addition, Sims has explained in his deposition that Kroger full-time personnel and guest care personnel can override checks as a manager, and that Victoria Keyes, as a full-time Kroger employee who sometimes worked in guest care, had the ability to override as a manager. Thus, the evidence of record belies plaintiff's arguments, which are not supported by competent, probative evidence.

Punitive Damages

Kroger is entitled to summary judgment on plaintiff's claim for punitive damages. Plaintiff has offered no evidence that Kroger, as opposed to Keyes, was grossly negligent or acted recklessly or maliciously.

> Under [Mississippi Code Annotated] § 11-1-65, punitive damages may not be awarded unless the Plaintiff proves by clear and convincing evidence that the defendant against whom the punitive damages are sought acted with actual malice or gross negligence which evidences a willful, wanton or reckless disregard for the safety of others. *This statute "absolutely forecloses vicarious liability for punitive damages*." Duggins v.

39

Guardianship of Washington, 632 So. 2d 420, 423 (Miss. 1993).

Bradley v. Wal-Mart Stores, Inc., Civil Action No. 2:04cv360JMR, 2006 WL 2792338, at 4 (S.D. Miss. Sept. 27, 2006) (emphasis added).

ADDITIONAL MOTIONS:

Plaintiff's Motions for Hearing

Plaintiff has filed two separate motions for a hearing on the motions for summary judgment filed by Cato and its co-defendant, Kroger Company.  In her original motion for a hearing, plaintiff stated that she wants the opportunity to "confront both Cato and Kroger with the facts of genuine issues that exists to Plaintiff claims."  In her more recent motion, she asks for a hearing "to allow Plaintiff to put forth the facts along with the evidence to show conclusively that the Defendants Cato and Kroger motion for summary judgment is frivolous."  Pursuant to Uniform Local Rule 7.2(F)(1), "[a]ll motions shall be decided by the court without a hearing or oral argument unless otherwise ordered by the court on its own motion or, in its discretion, upon written request made by counsel in an easily discernable manner on the face of the motion or response."  In the court's opinion, the facts and law have been fully briefed by the parties so that there is no need for a hearing on the motions for summary judgment.

Cato's Motion to Strike:

After Cato had filed its rebuttal memorandum on its motion for summary judgment on February 14, 2008, plaintiff filed a response to Cato's rebuttal memorandum on February 27, 2008. Plaintiff also filed at that time a motion to request permission to file exhibits under seal, stating that exhibits attached to her response to Cato's rebuttal memorandum and in support of her opposition to Cato's summary judgment motion "contain personal information that needs to be held confidential."[24]

Cato has moved to strike plaintiff's response to its rebuttal, arguing that this pleading is not permitted by the court's rules and adds nothing substantive to the argument.  It also seeks to strike plaintiff's motion to file exhibits under seal, contending that this "adds nothing to the record."  In her response to Cato's motion to strike, plaintiff argues that she has argued important points in her response to Cato's rebuttal that are vital to her case, and she submits that this response includes information that was not available to her at the time she filed her response concerning testimony from Lonnell Sheard, whose deposition transcript was unavailable at the time she filed her original response.  The deposition of Lonnell Sheard is a part of the record herein, and to the extent her response to the rebuttal

---

[24]     The request to file exhibits under seal will be denied. It appears that with the exception of Lonnell Sheard's deposition, plaintiff has already filed all of these exhibits, including those that would appear to contain personal information, as exhibits to her original responses to defendants' summary judgment motions.

addresses Sheard's testimony, the response is allowed.  Her response otherwise merely reasserts and/or refines arguments that were made in her original response or asserts arguments and evidence that should have been previously presented; those matters have been disregarded.

CONCLUSION

Based on the foregoing, it is ordered that Cato's motion for summary judgment is granted.  It is ordered that Kroger's motion for summary judgment is granted in part and denied in part, as set forth herein.

SO ORDERED this 20th day of June, 2008.


                                        /s/ Tom S. Lee
                                        UNITED STATES DISTRICT JUDGE